J-S75002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| M.P.B. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| K.J. | |
| | No. 1764 EDA 2016 |

Appeal from the Order Entered May 10, 2016
In the Court of Common Pleas of Montgomery County
Civil Division at No(s): 2009-02505

BEFORE: BOWES, MOULTON AND MUSMANNO JJ.

MEMORANDUM BY BOWES, J.: **FILED NOVEMBER 28, 2016**

M.P.B. ("Father") appeals from the custody order awarding K.J. ("Mother") primary physical custody of their minor son, D.B., and granting him periods of partial physical custody. We affirm.

Mother and Father never married. D.B. was born during May 2007 as a consequence of the parties' brief dalliance. Five months into the pregnancy, Mother informed Father that she was pregnant. Father attended D.B.'s birth, but he did not maintain contact with his infant son.

During 2008, Mother surreptitiously moved with D.B. to New Hampshire in order to marry R.J. ("Stepfather"). After Father discovered Mother's location, he filed a custody complaint in Pennsylvania. On April 15, 2009, the parties fashioned a custody arrangement in which they shared

legal custody, Mother maintained primary physical custody in New Hampshire, and Father exercised monthly periods of partial physical custody.

While living in New Hampshire, Mother became concerned that Stepfather might be abusing D.B. sexually because the child started speaking and behaving inappropriately. Mother reported her fears to child protective services, left Stepfather, and returned with D.B. to Pennsylvania. She reunited with Stepfather in New Hampshire after an investigation deemed the report unfounded. During June 2012, Stepfather pled guilty in New Hampshire to child pornography charges that did not involve D.B. Mother initiated that investigation after alerting authorities that she had discovered suspected child pornography on her husband's computer. Thereafter, Mother initiated divorce proceedings against Stepfather and relocated with her son to Pennsylvania permanently. She and D.B. began to reside in an apartment that Father secured for them.[1] During this period, Father exercised weekly periods of physical custody and enjoyed liberal visitation.

Allegations of abuse were not limited to Stepfather. In total, five allegations of physical abuse were leveled against Father by either Mother or

---

[1] As a first grader, D.B. was diagnosed with Attention Deficit/Hyperactivity Disorder ("ADHD") and was prescribed between 5 mg and 10 mg of Ritalin per day. He also has diagnoses of Autism Spectrum Disorder, and unspecified Disruptive Impulse-control and Conduct Disorder.

D.B.'s pediatrician based upon unexplained injuries and bruises that occurred while in Father's care. All of those allegations were deemed unfounded.

In March 2015, Mother was committed to a mental health facility for two weeks following the sudden death of her younger brother. Mother, who was victimized repeatedly as a child, has an extensive history of mental illness with multiple hospitalizations dating back to 1988. She has been on total psychiatric disability since 1993 and she has residual cognitive defects from a traumatic brain injury that she sustained in 1999. Prior to the 2015 hospitalization, Mother's most recent inpatient treatment occurred in 2006. Based upon the latest hospitalization, Father filed a petition for emergency custody, which the court granted, awarding him sole legal custody and primary physical custody of D.B. The order did not carve any specific periods of partial custody for Mother, but it permitted her to visit D.B. upon her release from the facility, so long as Father agreed.

At the conclusion of Mother's two-week hospitalization, Father limited Mother's access to D.B. As a result, she petitioned the trial court for modification of the emergency custody order. The trial court ordered Mother to undergo a mental health evaluation, and upon review of the evaluator's findings, it reinstated the April 2009 custody arrangement with a modification that enlarged Father's periods of alternating weekend custody. Father sought reconsideration, which led to a series of countervailing

petitions that ultimately culminated in the two-day custody trial that is the genesis of this appeal.

During the trial, Mother testified and presented her long-term psychotherapist, Melisa Hubsher, Psy.D., to introduce evidence regarding her mental health. Father testified on his own behalf, and the court-ordered custody evaluator, Gerald F. Bellettirie, Ph.D., discussed his thorough, seventy-page custody evaluation and recommendation. Dr. Bellettirie first provided an extensive historical review and summarized his evaluations of D.B. individually and with each parent in his and her respective homes. Next, he outlined the best-interest factors set forth in 23 Pa.C.S. § 5328(a), and recommended that Mother and Father share equal physical custody of D.B., provided that the trial court ensure that Mother continue mental health treatment. Referencing the child's aversion to change, Dr. Bellettirie stressed the importance that D.B. remain in his current school in the district where Mother resides. *See* Custody Evaluation, 11/22/15, at 70 ("Change is a very difficult adjustment for a child with [D.B.]'s developmental disorders."). He added that "[D.B.] should not be separated from his mother for any unnecessary extended period of time. [He] has already been traumatized from being separated from mother for an extended period of time in the past." *Id*. at 68-69.

At the close of the trial, the trial court presented its on-the-record analysis of the best-interest factors and outlined the terms of the ensuing

custody award. Five days later, on May 10, 2016, the trial court entered a final custody order awarding Mother primary physical custody of D.B. and granting Father partial physical custody Wednesday overnight and alternating weekends. The custody order incorporated Dr. Bellettirie's recommended safeguards relating to the trial court's monitoring of Mother's continued mental health treatments. This timely appeal followed.

Father complied with Pa.R.A.P. 1925(a)(2)(i) by filing a concise statement of errors complained of on appeal concurrent with his notice of appeal. The trial court entered a Rule 1925(a) opinion addressing the merits of Father's claims. The matter is ready for our review.

Father frames his assertions in four prolix questions, which we condense into two succinct issues: (1) whether the trial court's best-interest analysis is contrary to the statutory directive to give weighted consideration to factors that affect the safety of the child; and (2) whether the trial court erred in weighing the second, seventh, fifteenth, and sixteenth custody factors pursuant to 23 Pa.C.S. § 5328(a). Father's brief at 7-8.[2]

In *M.J.M. v. M.L.G.*, 63 A.3d 331 (Pa.Super. 2013), we reiterated the applicable scope and standard of review as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We

---

[2] The first issue implicates the question Father listed as IV in his brief. The second issue combines the questions Father presented in I-III.

must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child.

*J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa.Super. 2011) (citation omitted).

*M.J.M.*, *supra* at 334.

Pursuant to 23 Pa.C.S. § 5328(a), the determination of a child's best interest requires the examination of the following factors:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328.

Herein, the trial court weighed the applicable factors in awarding Mother primary physical custody of D.B. and granting Father periods of partial physical custody. The trial court found that factors one, three, four, nine, ten and sixteen militated to varying degrees in favor of Mother. Factors two, five, six, seven, eight, eleven, twelve, thirteen, fourteen, and fifteen were either inapplicable or did not inure to either parent's advantage. None of the factors entirely favored Father.

The first issue challenges the weight of the evidence adduced at trial. Essentially, Father maintains that the trial court either ignored certain evidence or failed to view the evidence through the prism of the "weighted consideration" of his son's safety. Father's brief at 19, 34-36. He asserts, "At the very least, proper consideration of the [f]actors weighs in favor of an award to Father of substantially more custody time than the Order . . . awarded him." *Id*. at 34. Thereafter, he concludes, "Had the court given the appropriate weighted consideration to Factors 2 and 15 . . . it would have properly concluded that an award of primary custody of [D.B.] to Father was warranted." *Id*. at 36. These positions fail for at least two reasons. First, Father misinterprets our standard of review and ignores our deference for the trial court's role as fact finder. Father cannot dictate the weight the trial court attributes to any single factor. Indeed, as we

highlighted in **M.J.M.**, *supra* at 339, "it is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case."

Furthermore, the trial court did, in fact, engage in the appropriate review. Stated plainly, the trial court examined factors two and fifteen through the prism of D.B.'s safety and, as the ultimate arbiter of fact, it concluded that both factors were neutral. Father's present contention effectively demands that we re-examine the evidence presented during the two-day hearing in a more favorable light to him in order to attain a different conclusion. We decline to revisit the trial court's factual findings which are supported by the certified record in order to reassess the weight of the evidence. **J.R.M.**, *supra* at 650 ("with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand"). Thus, this claim fails.

In his remaining assertions, Father argues that the trial court's rationale was tantamount to an abuse of discretion or unreasonable as shown by the evidence of record. Father's arguments contest the trial court's deliberation as to four of the best-interest considerations: two, seven, fifteen and sixteen. Of those factors, sixteen is the only one that the court found to lean in Mother's favor. The trial court deemed the second, seventh, and fifteenth factors to be neutral.

Concerning factor two, consideration of present and past abuses, Father asserts that the trial court disregarded Mother's inappropriate responses to the allegation that Stepfather abused D.B and Stepfather's child pornography convictions. Specifically, he assails Mother's judgment in returning to New Hampshire to reunite with Stepfather after the investigation deemed the abuse allegations unfounded. Father contends that, in light of the statutory requirement that the trial court give weighted considerations of the factors that affect the child's safety, the court erred in discounting Mother's poor judgment as it relates to whether she can provide adequate safeguards and supervision of her son. Father's brief at 22-26. He asserts that the second factor should have weighed heavily in his favor.

In rejecting Father's claim regarding Mother's momentary reconciliation with Stepfather prior to her 2012 discovery of child pornography on his computer, the trial court observed that Mother returned to New Hampshire after the allegations regarding D.B. had been deemed unfounded and left again when she discovered Stepfather's predilection for child pornography. Moreover, as the trial court pointed out, Mother terminated contact with Stepfather and has not interacted with him for more than three years. In sum, the court concluded that Stepfather does not present a risk of harm to D.B. and Father's concerns regarding those allegations do not implicate any current members of Mother's household.

Father also challenges the trial court's consideration of the unfounded allegations of abuse that were leveled against him in addressing this issue. He argues that the court inappropriately equated those unfounded allegations with Stepfather's confirmed behavior. He is mistaken. While the trial court referenced the allegations of physical abuse against Father and noted the difficulty in proving how the injuries were sustained, it did not find that Father was the perpetrator of abuse, deem Father unsafe, or assess the factor against him due to the unfounded allegations. Moreover, the trial court did not equate the unproven allegations of physical abuse with Stepfather's perversions. In reality, in reference to Mother's brief return to New Hampshire, it noted that, like the unfounded accusations against Father, the allegation that Stepfather had abused D.B. was equally difficult to prove. Thus, to the extent the court compared the allegations of abuse leveled in this case, the comparison was limited to the respective unfounded accusations against Father and Stepfather. Father's complaint that the court equated Stepfather's child pornography conviction with the investigation into the unexplained bruises on D.B.'s legs distorts the trial court's analysis.

Finally, as it relates to Mother's judgment, we further observe that Mother initiated the abuse investigation against Stepfather based upon D.B.'s comments and, while she briefly reunited with Stepfather after the initial allegations were deemed unfounded, upon discovering the suspected child pornography on Stepfather's computer, she severed the relationship

permanently and reported Stepfather to law enforcement authorities. Contrary to Father's contentions, Mother's decisions under these circumstances does not evince poor judgment. Mother removed D.B. from danger, returned when the perceived threat was deemed unfounded, and ultimately reported her husband to authorities when she discovered that unrelated crime. The trial court's determination that this factor did not weigh in favor of either parent is reasonable as shown by the forgoing evidence of record. Hence, we discern no abuse of discretion.

While Father frames his next issue as a challenge to factor seven, the well-reasoned preferences of the child, in reality he contests the trial court's catchall consideration under sixteen. The crux of this complaint is that, having determined under factor seven that D.B.'s preference to live with Mother was not well reasoned in light of the child's maturity, the trial court erred in relying upon the child's preference in considering factor sixteen. Significantly, in addressing factor sixteen, the trial court noted D.B.'s preference of Mother over Father and observed that the child will have difficulty managing drastic changes to his surroundings. The portion of Dr. Bellettirie's report that referenced the seventh custody factor, *i.e.*, the child's preference, influenced these findings. Succinctly, the report identified D.B.'s strong preference for Mother but indicated that the preference was mitigated by the child's age. Father submits that if the preference was inadequate under factor seven, it was improper to consider it in addressing factor

- 12 -

sixteen. Reduced to its core, Father's argument is that if the child's preference for Mother over Father is not well reasoned, it is innately unreliable. Again, no relief is due.

In addressing this issue, the trial court explained that, while it declined to give weight to D.B.'s preference under factor seven, the child's commitment to Mother was nevertheless relevant to the child's best interest determination generally, and it was specifically germane to assessing D.B.'s ability to manage changes to his environment and his reaction to being separated from Mother for extended periods. First, it is obvious that both the court-appointed expert and the trial court found that D.B.'s preference toward Mother was, in fact, grounded in reason, albeit the reasoning of an eight-year-old child. During the custody evaluation, D.B. indicated that, for two years, he had hated Father. *See* Custody Evaluation, 11/22/15, at 52. D.B. perceived Father as the reason that he was separated from Mother, and Dr. Bellettirie reported that D.B. stated that "when he was with [F]ather for 135 days[,] . . . he missed . . . [M]other and wanted to try to escape." *Id*. at 70. Indeed, D.B.' feelings were so fervent that he instructed Dr. Bellettirie to inform the trial court about everything that he had said about Father during the sessions, and, at the end of the evaluation, D.B. rebuffed Father's interaction and, as relayed by Dr. Bellettirie, "[D.B.] told [F]ather that he said a lot of bad things about him [during the evaluation]." *Id*. Thus, contrary to Father's characterization of the D.B.'s partiality as

- 13 -

intrinsically unreliable, Dr. Bellettirie did not merely reject D.B.'s preference as unreasoned. Instead, the custody evaluator discounted the child's preference under factor seven because it was formed through the perspective of an eight-year-old child **as compared to an older child**. *See* ***B.C.S. v. J.A.S.***, 994 A.2d 600, 604 (Pa.Super. 2010) (as children grow older, more weight must be given to preference).

Moreover, as the trial court pointed out, Dr. Bellettirie testified that change is difficult for D.B. and that, in light of D.B.'s strong attachment to Mother, "[Dr. Bellettrie] did not think it would be a good idea for this child to be away from his mother for prolonged periods of time[.]" N.T., 5/5/15, at 34-35. Mindful of D.B.'s statements to Dr. Bellettirie regarding his perspective of Father, it was reasonable for the trial court to reference D.B.'s overwhelming fondness for Mother in considering what changes the child could manage and the potential impact of granting Father primary custody. Thus, even though the trial court declined to weigh the child's preference independently under factor seven, to the extent that the trial court referenced D.B.'s preference in weighing the child's rigidity and aversion to change under factor sixteen, the trial court did not abuse its discretion.

Finally, concerning factor fifteen, a parent's physical and mental condition, Father contends that the trial court disregarded the significance of Mother's chronic mental illness in concluding that this factor does not militate in his favor. The crux of Father's assertion is that "the issues that

Mother continues to experience are serious and continue to manifest themselves in her life." Father's brief at 32. The record belies Father's contention.

In rejecting this claim in its Rule 1925(a) opinion, the trial court first noted Mother's extensive struggles with mental illnesses in the form of bi-polar disorder, eating disorder, major depressive disorder, post-traumatic stress disorder, and borderline personality disorder. The court also recalled that Mother has had various commitments and suicide attempts and has used psychotropic medication and electroconvulsive therapy, formerly known as electroshock therapy. In addition, Mother has engaged in therapy with a psychologist for the last fifteen years. However, unlike Father, who argues that Mother's mental health problems present a current risk of harm to D.B., the trial court highlighted that Mother is addressing her illnesses appropriately. She was committed only once since D.B.'s birth, the 2015 hospitalization that led to Father receiving emergency custody, and she is diligently monitoring her mental health and managing her disorders. The court continued that, despite the brief setback associated with the tragic death of her younger sibling, Mother maintained primary custody of D.B. for the majority of his life without incident. In addition, she has avoided any other obstacles to her mental health, and she regularly attends her appointments with her mental health professionals.

The certified record supports the trial court's conclusion that Mother's history of chronic mental health problems does not preclude her from maintaining primary physical custody of D.B. In addition to the foregoing evidence supporting the trial court's position that Mother has been consistent with treatment, we observe that Dr. Bellettirie concluded that Mother's mental health was not fatal to her ability to parent. He testified, "certainly just the presence of a mental health diagnosis does not mean you can't function to take care of your child." N.T., 5/5/16, at 41. Indeed, as we noted, *supra*, Dr. Bellettirie recommended that Mother and Father share physical custody of D.B. equally, and he recommended specific safeguards to ensure that the trial court monitor Mother's mental health. The trial court adopted Dr. Bellettirie's positon that Mother's various diagnoses were not impediments to caring for D.B., and it implemented the safeguards in fashioning the custody order granting Mother primary physical custody of her son. N.T. Excerpted Findings of Fact, 5/5/16, at 17-18. The increase from shared custody to primary custody, which the court attributed to Mother's demonstrated progress during the six months since Dr. Bellettirie issued his recommendations and D.B.'s aversion to change, does not negate the custody evaluator's endorsement of her parenting ability. Since the certified record belies Father's assertion that Mother's mental illness poses a risk to D.B. when he is in her primary physical custody, no relief is due.

As the trial court's custody determination is reasonable in light of the evidence of record, we will not disturb it.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/28/2016